Good morning. May it please the Court, Melinda Cantrell on behalf of the Defendants and Appellants, the County of Los Angeles, the Los Angeles County Sheriff's Department, Sergeant David Valentine, and Custody Assistant Christopher Solomon. I would like to reserve four minutes for rebuttal. My plan today is to address the issue of qualified immunity on behalf of the individual defendants first, and then discuss the Monell cause of action, and finally to address the award of $600,000 in future medical expenses. With respect to the qualified immunity issue, I submit that defendants both should have been granted qualified immunity following the judgment. While the issue is reviewed de novo, I did want to go ahead and point out that there's been no written order or discussion or analysis of whether the defendants should have been entitled to qualified immunity or whether they should have been entitled to qualified immunity. I think the question is, as far as the individual defendants are concerned, there was a policy on the part of the county that would have precluded double-selling these two inmates. And the individual defendants didn't follow the policy. So why would they be entitled to qualified immunity? Respectfully, Your Honor, a violation of a jail policy does not amount to a constitutional violation. What we need to look at here is whether a reasonable officer, a reasonable officer, would have known that putting a violent person in a cell with somebody else could cause that somebody else to be injured. Your Honor, I respectfully disagree with your interpretation of the record. There was absolutely no indication known by these officers that inmate Gonzalez, who attacked the plaintiff, was violent. This individual was just combative? Wasn't there information he was combative? The information, he was checked as combative on the form based on undisputed evidence. Are two people. Correct. The reason, the only evidence of it on the night of the incident is that he threatened to spit at an officer. Regardless of the reason, when they saw that combative designation, the policy called for them not to double-sell him with Mr. Castro. And a reasonable person, whether an officer or not, it seems to me would recognize that the whole point of having a policy like that is to prevent injury to the noncombative person who is double-selled with them. Well, the policy is not to combine assaultive individuals together. And I would submit the law is not clearly established that a threat of spitting makes someone violent. I don't think you can define it that narrowly. If you define it that narrowly, yes, there is nothing that says that someone that's spitting is necessarily dangerous. But when they're listed as combative and they have a policy along those lines, and if, you know, maybe if it hadn't been listed as combative, then you would be in a completely different situation. Well, I would strenuously point out that what we're looking at here is not whether there was a violation of policy or not whether they did the best possible decision on the night of the incident. We're looking here as to whether there was deliberate indifference and the failure to protect the plaintiff. The jury found against you on that point. Your Honor, respectfully, that does not defeat by any means qualified immunity. In Ford v. Ramirez Palmer, the Court specifically said even if there is a finding of deliberate indifference by the officers, there still could be qualified immunity based on whether a reasonable officer That is legally correct. You're legally correct on that point. But we're still stuck with the facts of this case. I'm sorry. And that if the facts of this case, I think, are troubling. And then going to the jury, I think it's a really tragic situation, I don't think the officers got up that day and said they wanted someone to get hurt. But if you're not entitled to qualified immunity, once you get to the jury verdict and the verdict is entitled to all inferences in favor of it, there is a way that I think arguably that that can't be supported. That becomes, you know, if you don't win on the qualified immunity, the jury verdict is a harder one for you. Your Honor, certainly this was a sad case. The facts, though, known to the officers on the night of the incident were that Mr. Gonzalez was not involved in any fight prior to going to the station. He was not violent or resisting at the station. Hadn't he smashed a window or a glass at the bar? Yes. He smashed at the bar a glass door by the restroom, and he threatened to spit at an officer. Those are the only facts we have. That's not calm conduct, is it? Did you say odd conduct? Is everyone that comes in smash a door? Of course not. However, the important question is whether the law was clearly established such that no reasonable officer, not one, could have made the decision to house these inmates together in the detoxification cell, which is meant to hold the drunk individuals to protect them from their own safety. It has, you know, padded mattresses on the ground. It has no benches and no hard mats. Right. And so if he'd been in there by himself, all would be well and we wouldn't be here today. The question is whether every reasonable officer would have known that placing a belligerent and listed as combative individual into a cell that was unmonitored would create a serious risk of harm to the other individual. And I, you know, I guess just again, speaking only for myself, that seems fairly obvious. Well, again, Your Honor, we're not looking at negligence. We're not looking at the best policy. No, we're looking at deliberately indifferent. Deliberate indifference. When you put a combative person in with somebody who's fallen down drunk. And part of the requirement is that is unable to care for yourself or others. So if the other person's combative and someone is unable to care for themselves or others, is that a person that's going to be as likely to be a match for if it goes wrong? Well, let me stress, Your Honor, we're not looking at whether only there was a constitutional violation of deliberate indifference. I'm really focusing on the second prong and whether the law was clearly established. Well, the law was clearly established that you can't, that an officer can't put someone into harm's way when they're in custody. So whether this precise situation had arisen, maybe not, but the idea that someone has to be protected from harm while in custody, at least from the type of harm that is obvious, was well established, wasn't it? Your Honor, the California, excuse me, the United States Supreme Court has repeatedly stated over and over again, we are not looking at whether it's a clearly established broad proposition of law. Yes, you can't have deliberate indifference and you can't fail to protect these inmates. But on the other hand, you don't have to have what we used to call in law school the spotted cow. You don't have to have the spitting case in order to lose unqualified immunity. Well, respectfully, Your Honor, I've cited Ford v. Ramirez-Palmer, Pagos v. Morrison, Berry v. Sherman. In all of those cases, it was a failure to prevent attack by another inmate with a violent history. But there was entitlement to qualified immunity based on the specific facts of this case. But, you know, in the Ford case, the victim and his assailant had previously been housed together and they had consented to be housed together during the time period in question. That's totally different from the facts here, isn't it? Well, that inmate had an extensive history of violent assaults. I think he attacked 17 prior instruments. But it is totally different because those two people had been together before where violence had not occurred and they consented to it. Here you don't. I mean, you can't say that they're not factually distinct. You can read them different ways, but they're factually distinct. I understand, but what the Main Circuit focused on is that the information was not so clear to the defendants such that no reasonable officer would make the decision to house them together. In Pagos v. Morrison, there was qualified immunity because there was no knowledge of a propensity for violence. Here we have that officers have no knowledge of a propensity for violence by inmate Gonzalez, of fighting, of violent behavior, threat of spitting, punch to door. No information that he punched any other person, fought any other person, resisted, was violent in any way with any other individual on the night of the incident. Barry v. Sherman, there was actually a threat of violence by the attacking inmate, but it wasn't directed at the plaintiff. The evidence here is there were empty cells available to put Gonzalez in. Why did Valentine not do that? Well, because he was trying to house them in the detoxification cell, which is safer for intoxicated inmates. And in Ford v. Ramirez-Palmes, there was also single cells available. So, again, maybe this wasn't the best decision. Unfortunately, we know how the incident turned out to be tragic on the night of the incident. But I think, I strenuously believe you cannot say that every single reasonable officer would have known that these individuals couldn't be housed together because there was no threat of physical violence. And even if the decision is that that was a constitutional violation, I don't think the law has clearly established that to that extent, in that manner. The plaintiff hasn't cited any cases showing a threat of spit or, you know, punching a window says you absolutely can't be housed together. And I've cited three cases, four if you include Hopper. But the State does have a duty not to purposefully create a risk of harm, such as placing someone in a cell with someone who wants to do him harm. And that's clearly established by the Supreme Court with Pharma. We have no specific facts that these defendants knew that inmate Gonzalez wanted to do any harm to the plaintiff or that he wanted to do any harm to anyone. There was no indication of an impending physical attack by this individual. Do you want to spend any time on the Monell claim? Because now you're down to four minutes, which you wanted to save for rebuttal. I did. The Monell cause of action, generally, of course, you have, under Los Angeles v. Heller, a constitutional violation by an individual defendant as a result of an unconstitutional policy or custom and practice. The plaintiff in this case insisted that was not how he was going to prove Monell because the conduct by the officers he alleges was the wrongful conduct was the inmates shouldn't have been housed together. Well, isn't that right and doesn't that let you win on a much simpler basis because of the causation here is double cell. If the individual defendants had followed all of the county's policies, nothing bad would have happened to Mr. Castro, because it's really the decision to place the two together that was the causal link. And that's really not a Monell question. It's just a lack of proximate cause. The other issues, I mean, regardless of the audio monitoring, the video monitoring, the frequency of going to the cell, really the one problem was the place where they didn't follow the policy that would have protected him. That's exactly right, Your Honor. But that's not really a Monell issue. It's a causation issue, isn't it? That's exactly right, Your Honor. Let me ask you this as a practical matter. If we were to conclude for whatever reason, and I'm not saying we will, but if we were to conclude that the county and the sheriff's department are not liable, would there be a practical difference in what happens to the damages award? Other than the reversal of the judgment in favor of the plaintiff. Right. Would the plaintiff still get all the damages through? I don't know what California law is. Is the county on the hook for the money? The county still has to pay for the damages to the officer with the exception of the punitive damages, even if they're not liable under Monell, correct? That's what I'm trying to find out. Well, the ‑‑ if you're saying would the compensatory damages stand for against the individual defendants. Would the plaintiff get the money if the county is out of the lawsuit? Well, I don't think I can speak to that today. In general, yeah, I mean, we have an award of punitive damages. Well, it's a yes or no question. No, you can't answer this question. The Monell claim, if that were out, the county is still responsible for the claims against the officers with the exception of the punitive damages. The officers still, they're not, it's not the $600,000. If the county gets out on a Monell claim, that doesn't mean that the officers have to personally pay the $600,000. Yes, that's generally correct, correct. But the punitive damages, my understanding, are not before us, but they were stipulated for a top of $12,000 or something? $12,000 and $6,000. And the officers, the county doesn't pay punitives, right? It's up to the Board of Supervisors. Okay. So that's why I can't answer it. Okay. I'm sorry, finish the answer and then you. That was my, I was. Okay. Well, you're down to about a minute if you'd like to save it for rebuttal. I would, okay. But the future, California requires expert testimony on future medical expenses, and there's that case specifically in point regarding the amount, which we didn't have in this case. So I'll reserve the rest of my time. Good morning, Your Honors. John Burton for the plaintiff. Let me begin with the qualified immunity question. This was tried to a jury. There was a week-long trial. There was evidence on all these points that were decided by the jury. Well, but she's correct on the law that just because a jury, if the initial decision was wrong on qualified immunity, she can still contest that at this point. And the court could, it's not impossible, you know, it's, so you really need to take what the facts are, give them all inferences in favor of your client, and whether under those facts, if the court was wrong in not granting either of the officers qualified immunity, they can still raise that argument. They can still win if the court agreed with them. I'd like to invite your attention, Judge Callahan, to a recent decision by a Ninth Circuit panel. It was authored by Judge N.R. Smith and joined by Judge O'Scanlan, which holds that when a jury determines deliberate indifference in a jury trial, and then subsequently the question of qualified immunity is evaluated, the court reviewing qualified immunity is bound by the jury determination of deliberate indifference. Now, here the question is, is there sufficient evidence in the record to support the jury's finding of deliberate indifference? Right. And if we were to find that there was insufficiency of the evidence on deliberate indifference, then that would flip back on the other. And there are several points that were not highlighted in the earlier argument that I'd like to focus on. Number one, the jury was very carefully instructed on the difference between deliberate indifference and negligence by the court. Number two, there's a lot more evidence of deliberate indifference here than the instructions here either. Not to the substantive instructions on liability. And the court said deliberate indifference is the conscious disregard of a known risk. That is, knowing there's a risk and failing to take appropriate action, as opposed to negligence, which maybe is not appreciating the existence of the risk. They argued, oh, well, we didn't know he was combative. Let me just go through the evidence. Well, and the jury didn't believe it. Well, the jury rejected it, but they had a lot of evidence to reject it. First, there are videos of Mr. Castro being brought into the cell and Mr. Gonzalez subsequently being brought into the cell. We've attached them. They're the first item in our supplemental excerpt of record. Mr. Castro came in. It was very nonchalant. There was one guy searching him. The other guy was kind of standing around, looking around. When Mr. Gonzalez was brought in, there were six deputies escorting him into the search area with a field supervisor filming him. And then he was taken into the cell by, it's like, nine people. It almost looks like the stateroom scene from the Marx Brothers movie. There are so many deputies who go into the cell with him. Both the arresting deputy and the jailer independently classified Mr. Gonzalez as combative. The rule, as every LASD witness testified to at the trial, is that when an inmate is classified as combative, he is not to be housed with an inmate, another inmate, because of the risk of a fight. There were lots of empty cells. They also use the drunk tank at Beverly Hills, which is five miles away, something they do all the time. And when you're arrested for what your client was arrested for, that's because they're unable to care for themselves or others, right? Right. It was 647F. So you're less likely to be able to defend yourself in a fight if you're unable to care for yourself or others. Absolutely. That's an element. And he was in there to sober up. He just had too much to drink on a party bus from San Diego to the Sunset Strip. That's why he was there. But it goes on. After they were put in the cell, these two men. Does Sergeant Valentine know this? Yes. He's right there. He's on the video. He testified that he approved placing Mr. Castro and Mr. Gonzalez in the cell together. On the video, you see them outside. He and Solomon, the jailer, talking for a minute or two when they were asked, what were you talking about? They didn't recall. They didn't testify. Then they walk away. But then Castro comes to the window. Because the only video is of the window. There's a big cell, but no one can see in. And he pounds. And we can see on the video, he pounds for a full minute. And the evidence was that Jailer Solomon heard the pounding and just didn't bother coming. But it gets worse. Well, Solomon said he didn't hear it. But then there were some jail people that said that you can hear in that area and then you have that. And so the jury obviously did not believe Solomon that he didn't hear it. Right. And when you see the layout, I mean, they're right next to each other. Well, and then I know that you have the community, the volunteer, that sees something going on, reports it, and then it was, what, 20 minutes after that before? No, it was six minutes after that. Oh, six minutes. The volunteer, untrained, was doing the mandatory 30-minute cell checks that are required by the federal regulations rather than Solomon. We can see him on the video, look in the cell, kind of walk away, look back, look a while, kind of walk away, look back again a third time, like he's seeing something really unusual. This man has died, so he didn't testify. And then he goes to Solomon, and according to Solomon's report, he says, Castro appears to be asleep or unconscious, and this man Gonzales is touching him inappropriately on the thigh. Counsel, before you run out of time, I'd appreciate your addressing the question of the proof of the compensatory damages pertaining to future medical care. The county and the individuals are asserting that the evidence was insufficient because of lack of expert testimony. Yes. I believe it is that Judge Fischer's ruling on that, having sat through the trial and heard all the evidence, is correct and should be upheld. I'm not, in preparing for the argument today, I actually was somewhat unclear as to what exactly this appeal is based on, whether the jury shouldn't have been instructed on future damages, which I think is one standard of proof, or whether it was the JMOL Rule 50B motion, which they're appealing, which there wasn't sufficient evidence. But there was no Rule 50A motion made when Plaintiff rested, so I don't think there can be a Rule 50B motion. Or they also suggest that it's plain error, and they also, in other words, they didn't raise the appropriate objection. Well, but they did, they said that the amount of damages was based on, the $600,000 was based on speculation, right? And that part of that speculation had to do with, I think, well, it's California law, and so did they, you heard them say that they're saying that you should have had an expert. Why didn't you need to have an expert? Well, we did have experts. There were six medical experts who testified in the case. The experts on damages testified as to his ongoing and future need for care. So there was testimony about the scope of his past care, his physical needs, and the need for future care. I took their position to be that you had to have also some kind of economics expert to digest all that information. I mean, you had the $1 million of past expenses incurred, and you had people talking about what he needed in the future for his care. I thought they were saying under California law you also had to have an economic expert to put all that together. But I don't know if that's right or wrong. It's, in plaintiff view, that's incorrect, Your Honor, and thank you for highlighting the issue like that. The plaintiffs did designate such an expert, Mr. Bruno, Dean Bruno, well known. They're called life care planners, and elected not to present him at the trial. These, of course, involve all sorts of competing interests, not the least of which. Oh, I know, but we have to go by the trial evidence. We can't, you know, whether you need to have that evidence as a matter of law in the trial. Had the defendants followed the appropriate procedure of making a Rule 50A motion, the reason that that rule is there is so that there's not sandbagging. And so the judge can say, I agree, you need to have an expert on this. And we can say, can we reopen and call Mr. Bruno, who's our designated expert? That's why that rule is there, and that's why it would be unfair in this case. But regardless of the waiver, there was ample evidence. Dr. Schaffer said he's going to need care in the future. Dr. Perper said he's going to need care in the future. Dr. Fisk said he needs assistance. He's going to have premature dementia. And presumably they are allowed to, the jury's allowed to extrapolate from the previous dollar amounts into the future based on what the scope of past care and future care is. And that's exactly what happened in this case. The defendants stipulated to a wide range of special damages, medical damages, almost a million dollars' worth that covered psychiatric, psychological, neurological, all cognitive assistance, just somebody who helped him when he couldn't remember. Right. But does the law require that it be reduced to present value? And you had no expert on that. And at today's discount rates, when you take inflation and likely return, present value is insignificantly different. And these were argued and they were instructed on present value. We don't know. We hope that Mr. Castro is going to live out his 50-plus year life expectancy, maybe exceed it in fine order. But he's at a very high risk, like a football player or a boxer, of developing a premature dementia, because he has very significant loss of brain tissue that is shown on the MRIs of his brain that were caused both by the trauma of having his head stomped on in the cell, and also he was essentially not breathing for an extended period of time. He was blue. He had a very high pH level, which indicates oxygen deprivation. So some of his brain damage is anoxic, some of it is traumatic, and it's permanent. And so he has a very, very uncertain future. And a jury is entitled to look at that. They did not award what the plaintiff asked. They awarded, I believe, 60% of the proposed number. They had all of this evidence of what current medical treatment is worth, and they had a pretty good idea of what might happen to Mr. Castro over time. Obviously, he could get run over and killed tomorrow, and that would not happen. But he's got major, major brain defects. He can't work. And as he ages, he's likely to have to hire someone to go to the store to help him with daily hygiene, to do things that we all take for granted. In your remaining time, tell us something about the Monell claim against the county and the sheriff's department. Well, I understand the inconsistency that Judge Graber pointed out, that if they had followed the policy of not putting them together, this would not have happened. However, there was another reason why it happened, which is that the state regulations require that sobering cells, in particular, have what they call maximum visual and audio surveillance and a mechanism for summoning guards for help. People who are 647F, as we say in California, are in all sorts of danger. I mean, they can be overdosing on a drug. They can aspirate on vomit. Okay, we all know that. But under Monell, you have to show a customer practice, right, by the county? I see one incident in the record here, this tragic incident that occurred. So what's your customer practice evidence? The customer practice here is maintaining within the city of West Hollywood, which is a contract city, which is the relevant geographic area, a sobering cell that is dangerous. Now, there was another incident that happened in the cell, and that was kind of explained in the papers. It didn't come into evidence because of the drug. So as I understand your argument, though, it is that when you're maintaining a physical space that is a customer policy, it's not incident-based at all. It's physical configuration-based. And there is only one physical configuration. As I take it, that is your answer, in the briefing at least, to why all those single incident cases are completely irrelevant when the problem is architectural. Yes. Let me use my last one. But then there's all sorts of jails around the county that they're the way they are because there's no money otherwise to do anything. So are all of those jails then a customer? The sheriff would like to have a different jail, but there's no money to have a different jail. So all of those jails are then a customer practice under Monell? Well, there's no evidence in this case that budgetary requirements have anything to do with this. Can I just – I see my time is up, but I do want to address this question of indemnity just very quickly. The defendants moved for a bond, for relief from a bond pending appeal, because we wanted to execute against the individual deputies. And the court, over our objection, Judge Fischer, granted the bond. And in that bond they do make the representation that the county will be indemnifying the officers for all the compensatory damages. The law on the punitive damages is at the option of the Board of Supervisors. And the amount of punitives were stipulated as 6 and 12. So those are not before us. That's correct. And the jury made a finding, the requisite finding for an award of punitive damages, rather than bring the jury back after the verdict, put the officers on the stand, ask them about their finances and assets and so forth. We met, because there are many things that were agreed upon in the trial court, and just agreed on amounts. Thank you very much. Thank you, counsel. You have about a minute for rebuttal remaining. Why don't you just say what your best case is, that why not having this expert? Because what I'm reading is, because you're talking, I can't find a case that said it's absolutely required. I find indications that usually they do or there may be situations where, but what is your best case? Well, Cooper v. Chambie specifically says you need experts on the need and experts on the amount. In that case, there was $1.5 million of future medical expenses. All parties agreed. That's an unpublished case. What is its precedential value, if any, in California? Under 42 U.S.C. 1988a, there's no, when there's not a specific remedy, under Federal law, we look to the law of the foreign states. That's not my question. Cooper v. Chambie is an unpublished decision of the California Court of Appeal. Right. So does it have any precedential value? Do we have to pay attention to what it held? I think you can look toward it to see what a published case would hold. Also, Niles. It doesn't. I was on the State Court of Appeal in California. It doesn't have any precedential value. So what is your best precedential value case? FOX holds that you need an expert for present value. And we had ---- Well, it says you have to discount to present value, but does it say specifically that an expert is always required? I believe so, and I believe I said it in my brief. And I just wanted to also state for the record, at ER 150 to 151, defense counsel specifically stated that the future medical damages should not go to the jury because there's insufficient evidence. And the Court said, I don't have time to deal with that now. If they come back, I'll address it then. But then we had a summarily denied renewed motion for judgment. So I just wanted to point that out for the record. Thank you, counsel. If you've fully answered Judge Callahan's question, your time has expired. Thank you. We appreciate the arguments of both counsel. We gave you extra time, so you didn't need to make a face. I'm sorry. Okay. Understatement is always better than hyperbole. This was a very challenging case and is a very challenging case, and we appreciate what both of you have provided today. And the case is submitted.
judges: Gilman, Graber, Callahan